FILED
United States Court of Appeals
Tenth Circuit

December 27, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BREAKTHROUGH MANAGEMENT
GROUP, INC.,

       Plaintiff-Appellee-Cross-
       Appellant,

v.

CHUKCHANSI GOLD CASINO AND
RESORT; CHUKCHANSI
ECONOMIC DEVELOPMENT
AUTHORITY,

       Defendants-Appellants-
       Cross-Appellees,

and

RYAN STANLEY,

       Defendant-Appellant-Cross-
       Appellee.

Nos. 08-1298, 08-1305, 08-1317

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:06-CV-01596-MSK-KLM)**

---

Marc F. Pappalardo of Breakthrough Management Group, Inc., Longmont,
Colorado, for Plaintiff-Appellee-Cross-Appellant.

Michael A. Robinson of Fredericks Peebles & Morgan LLP, Sacramento,
California, for Defendants-Appellants-Cross-Appellees Chukchansi Gold Casino

and Resort and Chukchansi Economic Development Authority.

Lenden F. Webb of Law Offices of Lenden F. Webb, Fresno, California, for Defendant-Appellant-Cross-Appellee Ryan Stanley.

_____

Before **MURPHY**, **HOLMES**, Circuit Judges, and **ARMIJO**, District Judge.[*]

_____

**HOLMES**, Circuit Judge.

_____

This appeal asks us to explore the relationship between an Indian tribe and the economic entities created by the tribe, and to determine how close that relationship must be in order for those entities to share in the tribe's sovereign immunity. Plaintiff Breakthrough Management Group, Inc. ("BMG"), a provider of business management training and consulting services, filed suit in the United States District Court for the District of Colorado in August 2006. BMG alleged that the Chukchansi Gold Resort & Casino ("the Casino") had paid for a single-person license for one of BMG's online training programs and then recorded and used portions of that program without permission to train more than one employee. Because the Casino is operated for the benefit of a federally recognized Indian tribe, the Picayune Rancheria of the Chukchansi Indians ("the Tribe"), BMG brought federal and state-law claims against the Tribe, the Chukchansi Economic

_____

[*] The Honorable M. Christina Armijo, District Judge, United States District Court for the District of New Mexico, sitting by designation.

2

Development Authority ("the Authority), which owns and operates the Casino, the Casino, and several individual defendants. The defendants filed various motions to dismiss, arguing that they were protected from BMG's suit by the doctrine of tribal sovereign immunity and that the district court should dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

The district court granted the Tribe's motion to dismiss, holding that the Tribe was entitled to sovereign immunity and had not clearly waived that immunity by entering into licensing agreements with BMG that contained forum-selection clauses. The court denied Defendant Ryan Stanley's motion to dismiss, concluding that sovereign immunity did not extend to him because he had been sued in an individual rather than an official capacity. After an evidentiary hearing, the court also denied the Authority and the Casino's motion to dismiss, concluding that they were not entitled to share in the Tribe's sovereign immunity because any judgment imposed against them would not imperil the Tribe's monetary assets.

This appeal followed. The Authority and the Casino have appealed the district court's denial of their motion to dismiss for lack of subject matter jurisdiction (Appeal No. 08-1298), and Mr. Stanley has done likewise (Appeal No. 08-1305). BMG has filed a cross-appeal that raises an alternative ground for affirmance of the district court's order—*viz.*, that the Authority and the Casino, and by extension Mr. Stanley, have waived any immunity that they may otherwise enjoy by entering into BMG's licensing agreements (Appeal No. 08-1317). We have

3

jurisdiction over Defendants' interlocutory appeals under 28 U.S.C. § 1291 and the collateral order doctrine,[1] but we **DISMISS** BMG's cross-appeal for lack of jurisdiction. For the reasons discussed below, we **REVERSE** the district court's orders denying the Authority and the Casino's motion to dismiss and the motion to dismiss of Mr. Stanley and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

BMG is a Colorado Corporation that provides online business management training and consulting services. BMG alleges that employees at the Casino copied and distributed materials from one of BMG's training programs without authorization. The Casino, which operates for the financial benefit of the Tribe, had paid for a single-person license, but allegedly had recorded and used portions of the program without permission to train a large group of employees. Based on these allegations, BMG brought suit against the Tribe,[2] the Authority, the Casino, the former general manager of the Casino, Mr. Stanley, and two other Casino employees. BMG asserted claims for federal copyright infringement, trademark

---

[1]     A district court's order denying a motion to dismiss involving a claim of tribal sovereign immunity is an immediately appealable collateral order. *Osage Tribal Council ex rel. Osage Tribe of Indians v. U.S. Dep't of Labor*, 187 F.3d 1174, 1179–80 (10th Cir. 1999).

[2]     The Picayune Rancheria of the Chukchansi Indians of California is a federally recognized Indian tribe. *See* Indian Entities Recognized & Eligible To Receive Services From the United States Bureau of Indian Affairs, 67 Fed. Reg. 46,328, 46,330 (July 12, 2002). The parties also have stipulated to that fact.

4

infringement, and violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, as well as state common law claims for conversion, misappropriation, breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unfair competition, and violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101 to -115 (West 2010).

All of the defendants filed motions to dismiss, arguing in relevant part that dismissal was warranted under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction under the doctrine of tribal sovereign immunity. BMG opposed the motions. BMG also moved to convert the motions into Rule 56 motions for summary judgment and, in the alternative, for leave to conduct limited discovery on the issue of tribal sovereign immunity.

In a September 12, 2007, Opinion and Order, the district court granted the Tribe's motion to dismiss. The court determined that the Tribe "indisputably enjoys sovereign immunity," Aplts. App. at 21, and rejected BMG's argument that the Tribe had waived its immunity by entering into two licensing agreements with BMG that contained forum-selection clauses.[3] The court held that a contractual provision agreeing to arbitrate disputes could constitute a waiver of sovereign immunity when (1) there is an agreement to submit disputes to a body for

---

[3] The court assumed without deciding that the Tribe could be held to the terms of the licensing agreement, which was entered into by BMG and an agent of the Casino.

5

adjudication, as well as (2) an agreement as to what particular body will hear such disputes. But the court found that those requirements were not satisfied in this case.

The court reasoned that the Tribe did not expressly agree to submit any dispute for adjudication, it merely agreed *where* such adjudication would take place if it were to occur.[4] The court explained that

> the parties' agreement here speaks only to *where* a suit may be brought, but it does not expressly or impliedly address *whether* a suit may be brought. . . .
>
> At first blush, it seems awkward to read a contract to specify *where* disputes may be resolved, but not to read it as providing *whether* disputes may be resolved. However, any awkwardness in this interpretation vanishes when one recognizes the peculiar circumstances of this case. Here, unlike the ordinary citizen that [BMG] typically enters into contracts with, the Tribe possesses a special cloak of immunity from suit. Thus, language in [BMG's] standard contract that would be sufficient to bind ordinary citizens to a particular dispute-resolution mechanism is not necessarily sufficient to bind the Tribe.

*Id*. at 20. The court concluded that, because BMG did not negotiate the terms of the contract with the Tribe, "it should not be surprising that the standard terms of [the licensing agreement] yield seemingly awkward results in this peculiar factual circumstance." *Id*. at 21.

---

[4]     As the district court recounted, the forum-selection provision stated that "the sole and exclusive *venue* for any and all disputes involving . . . this Agreement shall be the state and federal courts located within the state of Colorado." Aplts. App. at 20 (internal quotation marks omitted).

6

The court did not rule on the Authority and the Casino's motion to dismiss in the September 12, 2007, Opinion and Order because it could not determine from the pleadings whether the Authority and the Casino "enjoy[ed] a connection to the Tribe close enough to enjoy the Tribe's own immunity." *Id.* at 23. The court therefore scheduled an evidentiary hearing on that motion and denied as moot BMG's motion to convert the motions to dismiss into Rule 56 motions for summary judgment. The court also denied BMG's request "to specifically authorize discovery in advance of this hearing," holding that, if the Authority and the Casino were entitled to immunity, such discovery would "chip away at the benefits of . . . immunity." *Id*. at 23 n.8. But "[t]o ensure that both sides have a full and fair opportunity to examine the relevant documents and prepare their case," the district court ordered them to exchange copies of all exhibits ten days before the evidentiary hearing and held that the parties could subpoena any other documents up to three days prior to the hearing.[5] *Id*.

In that same order, the district court denied Mr. Stanley's motion to dismiss, finding that, because BMG was asserting claims against Mr. Stanley in his individual rather than official capacity, he was not entitled to tribal sovereign immunity. The court also granted the motion to dismiss for lack of personal

---

[5]     Although the district court referred only to the parties' ability to subpoena documents, it indicated at the evidentiary hearing that the parties also could subpoena witnesses pursuant to Federal Rule of Civil Procedure 45.

7

jurisdiction brought by two employees of the Casino, Jeff Livingston and Vernon D'Mello. They are not parties to this appeal.

The district court held an evidentiary hearing on the Authority and Casino's motion to dismiss on October 23, 2007. At the hearing, the parties stipulated to the admission of approximately seventy-one exhibits "for the sole purpose of whether the *Johnson* . . . test is met and not for any other issues, such as whether there has been a waiver of immunity." Aplee. Supp. App. at 99–100 (Tr., Evidentiary Hr'g, dated Oct. 23, 2007). The court also heard testimony from Dustin Graham, the chairperson of the Tribal Council. After the hearing, the parties filed a stipulation detailing the agreed-upon facts.

In an August 5, 2008, Opinion & Order, the district court evaluated the relationship between the Tribe and the Authority and the Casino under a ten-factor test articulated in an unpublished district court opinion, *Johnson v. Harrah's Kansas Casino Corp.*, No. 04-4142-JAR, 2006 WL 463138 (D. Kan. Feb. 23, 2006). Under *Johnson,* there is a threshold financial-liability inquiry that must be satisfied before a court will consider other factors measuring the closeness of the relationship between a tribe and its economic entities. As applied here, the inquiry is "whether the Tribe will be financially liable for legal obligations incurred by the Casino and the Authority." Aplts. App. at 45. Based on that threshold inquiry, the district court in this case denied the motion to dismiss.

8

Specifically, the court found that the Authority was governed by a board with identical membership to the Tribe's governing Council. The court further found that the Authority owns and operates the Casino. But the court nevertheless concluded that the Authority and the Casino were "non-Indian entities" that were not entitled to invoke the Tribe's sovereign immunity because a judgment against them "w[ould] not result in direct financial liability for the Tribe or otherwise imperil the Tribe's assets." *Id.* at 47. Even though the court found that the Casino's revenues go solely to the Authority and that the Authority then gives that money to the Tribe, the court found that the Tribe's *right to receive* profits would not be threatened by a judgment, only the *amount* of profits would be adversely affected.

The court reached that conclusion based on "evidence indicat[ing] that the Authority is obligated to pay over to the Tribe at least $1 million per month, regardless of its actual revenues." *Id*. at 46. Therefore, "should the actual profits fall short, the Authority will borrow or run a deficit to ensure that the Tribe receives that which it is entitled to." *Id*. at 47. Thus, the court concluded, "the judgment would neither deprive the Tribe of its asset—the right to receive profits—nor its guaranteed minimum payment." *Id*. at 48. The court also found that the Authority was created to serve as a non-immune entity for creditors so that they would be more willing to lend money to the Tribe. The district court accordingly denied the Authority and the Casino's motion to dismiss. These

9

interlocutory appeals timely followed.

## DISCUSSION

The Authority and the Casino[6] argue that the district court erred in denying

their motion to dismiss. They urge us to find that they qualify as subordinate

economic entities entitled to tribal sovereign immunity because

> [a]n unincorporated entity created by and wholly owned by
> a federally recognized Indian tribe for the sole purpose of
> promoting tribal interests through the ownership and
> operation of a Class III Indian gaming facility on behalf of
> the . . . Indian tribe is . . . an Indian entity. [T]o protect
> critical tribal and federal interests such an entity, [the
> Authority,] as well as the Class III Indian gaming facility[,
> the Casino], must be allowed to invoke tribal sovereign
> immunity from suit.

Aplts. Opening Br. at 9. They ask us to reject the *Johnson* test employed by the

---

[6] Mr. Stanley is also a party to this appeal. Although the district court rejected Mr. Stanley's motion to dismiss based on its conclusion that he had been sued in his individual capacity rather than in an official capacity, that distinction is not at issue on appeal. The parties now agree that Mr. Stanley was acting in the course and scope of his employment at the Casino and, consequently, whatever immunity is enjoyed by the Authority and the Casino is shared by Mr. Stanley. *See Burrell v. Armijo*, 603 F.3d 825, 832 (10th Cir. 2010) ("Tribal sovereign immunity generally extends to tribal officials acting within the scope of their official authority. On the other hand, a tribe's sovereign immunity does not extend to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him." (citation omitted) (internal quotation marks omitted)); *Dry v. United States*, 235 F.3d 1249, 1253 (10th Cir. 2000) ("Due to their sovereign status, suits against . . . tribal officials in their official capacity 'are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress.'" (quoting *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997))). Because the parties agree that Mr. Stanley's entitlement to immunity is derivative of any immunity enjoyed by the Authority and the Casino, for ease of reference we will discuss only the Authority and the Casino.

10

district court and instead urge us to consider the factors we recently applied in *Native American Distributing v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288 (10th Cir. 2008)—that is, in particular, the manner in which the entity was created, the purposes the entity was intended to fulfill, and whether the tribe intended for the entity to have immunity. The Authority and the Casino argue that the evidence clearly demonstrates that they were created to serve the Tribe's interests in economic development, self-sufficiency, and self-governance, and that the Tribe intended for them to share in its immunity from suit. The Authority and the Casino maintain that, because all revenues generated by the Casino go to the Tribe through the Authority, and are used exclusively for tribal purposes, any "reduction in revenues [that would be caused by a judgment against the Casino or the Authority would] ha[ve] a direct [adverse] impact on the Tribe and its ability to provide for its economic development, self-sufficiency and welfare of its government and members." Aplts. Opening Br. at 23. And, finally, they argue that the Authority and the Casino did not waive their immunity by entering into the relevant contracts with BMG.

BMG argues that the Authority and the Casino cannot share in the Tribe's sovereign immunity because those entities are too far removed from the Tribe. BMG bases its argument on the following contentions: the Tribe is not liable for a judgment against those entities; the Authority's corporate charter provides that the Authority is a separate entity from the Tribe; the Casino's charter provides

11

that the Tribe is not liable for its actions and that it is owned by the Authority, not the Tribe; and the Authority and the Casino's liability insurance will cover any judgment against them, thereby protecting the Tribe's assets. BMG argues that we should apply the *Johnson* factors used by the district court to determine whether the Authority and the Casino may share in the Tribe's sovereign immunity and disputes the applicability of *Native American Distributing*.

BMG also argues that, if we determine that the Authority and the Casino are entitled to tribal sovereign immunity, we should nevertheless hold that they waived such immunity by agreeing to litigate any disputes in Colorado courts as part of BMG's licensing agreements. Finally, BMG maintains that if we do not affirm the district court's denial of the motions to dismiss, we should direct the district court on remand to allow BMG to conduct jurisdictional discovery and call witnesses on the issue of tribal sovereign immunity.

For the reasons discussed below, we conclude that the district court applied the incorrect legal standard—the district court erroneously treated the financial impact on a tribe of a judgment against its economic entities as a threshold inquiry. Our precedent demonstrates that there is no threshold determination to be made in deciding whether economic entities qualify as subordinate economic entities entitled to share in a tribe's immunity. Rather, we should look to a variety of factors when examining the relationship between the economic entities and the tribe, including but not limited to: (1) their method of creation; (2) their

12

purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.

We conclude that, under these factors, the Authority and the Casino have a sufficiently close relationship to the Tribe to share in its immunity. Because the district court wrongly concluded that the Authority and the Casino were not subordinate economic entities entitled to tribal sovereign immunity, and consequently did not reach the issue of whether the Authority and the Casino waived their immunity from suit through licensing agreements with BMG, we remand for the district court to address that question in the first instance. However, for reasons that we discuss below, we do not direct or require the district court to permit jurisdictional discovery in connection with such further proceedings.

## I.  The Authority and the Casino's Appeal

### A.  Standard of Review

Our inquiry into whether the Authority and the Casino are subordinate economic entities that share in the Tribe's immunity from suit involves a mixed question of law and fact. This case presents a legal issue—the appropriate test to determine whether economic entities associated with a tribe may share in the

13

tribe's immunity. It also presents a factual issue—involving the application of that test to the relationship between the Tribe and the Authority and the Casino.

Ordinarily, "[w]e review de novo a district court's denial of a motion to dismiss based on tribal sovereign immunity." *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007). But "[w]here, as here, subject-matter jurisdiction turns on a question of fact, we review the district court's factual findings for clear error and review its legal conclusions de novo." *Native Am. Distrib.*, 546 F.3d at 1293 (emphasis omitted); *accord United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 54 (1st Cir. 2009) ("When the district court does not rule on the pleadings alone but, rather, takes evidence in connection with a motion to dismiss for want of subject matter jurisdiction, the court's factual findings are reviewed for clear error."). In this case, the district court "ha[d] wide discretion to allow affidavits, other documents, and a limited evidentiary hearing," *Dry*, 235 F.3d at 1253 (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)) (internal quotation marks omitted), and its "reference to evidence outside the pleadings d[id] not convert the motion to a Rule 56 motion [for summary judgment]." *Holt*, 46 F.3d at 1003.

## B. Analysis

We would be remiss if we did not begin our discussion of the issues by acknowledging the relevant Indian-law context that shapes our analysis. Three major interrelated concepts play a role in this case: (1) tribal sovereignty, (2)

14

tribal sovereign immunity, and (3) tribal economic development. As the Supreme Court has recognized, "Indian tribes are distinct, independent political communities, retaining their original natural rights in matters of local self-government. Although no longer possessed of the full attributes of sovereignty, they remain a separate people, with the power of regulating their internal and social relations." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (citations omitted) (internal quotation marks omitted); *accord NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1192 (10th Cir. 2002) ("Indian tribes are neither states, nor part of the federal government, nor subdivisions of either. Rather, they are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate." (footnote omitted)); *Native Am. Church of N. Am. v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959) ("Indian tribes are not states. They have a status higher than that of states. They are subordinate and dependent nations possessed of all powers [except] to the extent that they have expressly been required to surrender them by the superior sovereign, the United States.").

Because Indian tribes are sovereign powers, they possess immunity from suit to the extent that Congress has not abrogated that immunity and the tribe has not clearly waived its immunity. *Santa Clara Pueblo*, 436 U.S. at 58; *Native Am. Distrib.*, 546 F.3d at 1293; *Berrey v. Asarco Inc.*, 439 F.3d 636, 643 (10th Cir. 2006). Not only is sovereign immunity an inherent part of the concept of

15

sovereignty and what it means to be a sovereign, but "immunity [also] is thought [to be] necessary to promote the federal policies of tribal self[-]determination, economic development, and cultural autonomy." *Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1378 (8th Cir. 1985); *accord* Patrice H. Kunesh, *Tribal Self-Determination in the Age of Scarcity*, 54 S.D. L. Rev. 398, 398 (2009) ("Tribal sovereignty and the jurisdictional counterpart of tribal sovereign immunity from suit are the bedrock principles of tribal self-determination."); *see also* Felix S. Cohen, Cohen's Handbook of Federal Indian Law §§ 7.05, 21.02[2] (Nell Jessup Newton et al., eds., 2005 ed.).

Tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity.[7] *See Native Am. Distrib.*, 546 F.3d at 1292; *see also, e.g.*, *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046–47 (9th Cir. 2006); *Ninigret*

---

[7]     We recognize that the Supreme Court has expressed reservations about the extension of tribal immunity to economic activities, but we note that the Court has deferred to Congress in this area. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 757–60 (1998); *see also Native Am. Distrib.*, 546 F.3d at 1293 (in discussing *Kiowa Tribe*, stating that "[w]hile the Supreme Court has expressed misgivings about recognizing tribal immunity in the commercial context, the Court has also held that the doctrine 'is settled law' and that it is not the judiciary's place to restrict its application"). And "Congress has consistently reiterated its approval of the immunity doctrine." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 510 (1991).

*Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st

Cir. 2000); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th

Cir. 2000). The broad interpretation of tribal sovereign immunity can trace its

origins to "Congress' desire to promote the 'goal of Indian self-government,

including its "overriding goal" of encouraging tribal self-sufficiency and

economic development,'" *Citizen Band Potawatomi Indian Tribe*, 498 U.S. at 510

(quoting *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216

(1987)), as well as to "Executive Branch policies, and judicial opinions," *Prairie*

*Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 824 n.9 (10th Cir. 2007). As

the Ninth Circuit has noted, immunity for subordinate economic entities "directly

protects the sovereign Tribe's treasury, which is one of the historic purposes of

sovereign immunity in general." *Allen*, 464 F.3d at 1047 (citing *Alden v. Maine*,

527 U.S. 706, 750 (1999)).

One of the ways that Congress has promoted tribal sovereignty through

economic development is particularly relevant to this case—the authorization of

Indian gaming. *See* 25 U.S.C. § 2702(1) (stating that the purpose behind the

Indian Gaming Regulatory Act is "to provide a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development,

self-sufficiency, and strong tribal governments"); *Cabazon Band of Mission*

*Indians*, 480 U.S. at 218–19 ("The Cabazon and Morongo Reservations contain no

natural resources which can be exploited. The tribal games at present provide the

17

sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members."); *see also generally* Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA"); Cohen, *supra*, §§ 12.01–02, 21.01.

A commentator has observed that "[t]ribal governments directly control or participate in commercial activities more frequently than other [types of] governments. . . . [T]he tribal organization may be part of the tribal government and protected by tribal immunity, even though it may have a separate corporate structure." William V. Vetter, *Doing Business with Indians and the Three "S"es: Secretarial Approval, Sovereign Immunity, and Subject Matter Jurisdiction*, 36 Ariz. L. Rev. 169, 174 (1994). That leads to the question presented here: "Does the resulting entity have a distinct, nongovernmental character and therefore is not immune, or is it merely an administrative convenience, *i.e.*, a 'subordinate [tribal] economic organization,' and therefore immune?" *Id*. at 176 (alteration in original). Put differently, we must determine whether the Authority and the Casino are "the kind[s] of tribal entit[ies], analogous to a governmental agency, which should benefit from the defense of sovereign immunity, or whether [they] [are] more like . . . commercial business enterprise[s], instituted solely for the purpose of generating profits for [their] private owners." *Gavle v. Little Six,*

18

*Inc.*, 555 N.W.2d 284, 293 (Minn. 1996).

BMG does not dispute the general principle that subordinate economic entities may share in a tribe's sovereign immunity; rather, BMG contends that, under *Johnson*, the entities in this case may not do so.[8] It argues that the

---

[8] However, BMG plainly is not entirely comfortable with the notion that subordinate economic entities may share in a tribe's sovereign immunity. Its reluctance to endorse that principle is demonstrated by its remark that "the Supreme Court has not ruled upon the issue of whether a separate business entity that is directly or indirectly owned by a tribe is subject to tribal immunity." Aplee. Answer Br. & Opening Br. at 19. But BMG's briefing nevertheless focuses on whether the Authority and the Casino can satisfy the *Johnson* test. BMG does not ask us to hold that economic entities can never share in a tribe's immunity from suit. It is just as well; that ship plainly sailed in *Native American Distributing*. We are bound by that precedent.

In advocating against the application of *Native American Distributing* at oral argument, BMG attempted to distinguish between the types of entities created by tribes—on the one hand, those created under tribal law, and, on the other hand, those created under Section 17 of the Indian Reorganization Act, 25 U.S.C. § 477, which authorizes the Secretary of Interior "upon petition by any tribe" to "issue a charter of incorporation to such tribe." *Id.* According to BMG, the Tribe did not avail itself of § 477 here, but rather created the Authority and the Casino under tribal law. On the other hand, it argues that in *Native American Distributing*, where we concluded that the tribe-related entity was immune from suit, the analysis turned on whether the tribe had created a § 477 entity. We are inclined, however, to believe that BMG's argument reflects a misreading of that case, which contains no mention of § 477. We also note that

> Section 17 is not the exclusive means for tribes to incorporate for business or other purposes—*i.e.*, tribes can create corporate entities under their own laws or those of other sovereigns. The principal legal difference is that, while section 17 corporations retain their tribal status—and, accordingly, sovereign immunity in the absence of a "sue and be sued" waiver—the other species of corporations are not imbued automatically with such

(continued...)

Authority and the Casino are independent from the Tribe to such a degree that they cannot share in the Tribe's sovereign immunity. Accordingly, we must first determine the appropriate test to measure the relationship between an Indian tribe and its economic entities, and then decide whether the Authority and the Casino are subordinate economic entities that share in the Tribe's immunity.[9]

---

[8](...continued)

> status. Courts nonetheless have resorted generally to a multi-factor inquiry, comparable to that employed in section 17 controversies, to decide whether the corporation constitutes an "arm of the tribe" and shares in the tribe's immunity from suit.

Clay Smith, *Tribal Sovereign Immunity: A Primer*, 50 Advoc. 19, 20–21 (May 2007) (footnotes omitted). However, we need not opine definitely on this purported distinguishing factor because BMG has waived this argument by not including it in its opening brief. We do not consider issues raised for the first time at oral argument. *See Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1235 n.8 (10th Cir.), *cert. denied*, 130 S. Ct. 742 (2009).

[9]  We note that the courts that have addressed this issue have utilized different turns of phrase to describe a tribe's economic entities. If the economic entities are held to be sufficiently close to a tribe so as to share in its sovereign immunity, courts have deemed those entities to be, *inter alia*, "an arm of the tribe," *Allen*, 464 F.3d at 1046; "a division of the Tribe," *Native Am. Distrib.*, 546 F.3d at 1293; "a tribal agency," *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998); and "a sub-entity of the Tribe," *Ramey Constr. Co., Inc. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982). Moreover, the doctrine has its roots in the Arizona state courts, which refer to it as "the subordinate economic organization doctrine." *See, e.g.*, *Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1108–12 (Ariz. 1989); *see also* Vetter, *supra*, 36 Ariz. L. Rev. at 177 (referring to "a subordinate tribal organization."). For the sake of consistency, we will refer to an economic entity entitled to tribal sovereign immunity as a "subordinate economic entity."

20

**1. The appropriate test to determine whether an economic entity is entitled to tribal sovereign immunity.**

As we have stated, to measure the closeness of the relationship between the Tribe and the Authority and the Casino, the district court applied a test adopted from an unpublished decision from the United States District Court for the District of Kansas, *Johnson v. Harrah's Kansas Casino Corp.* To understand that standard, we find it necessary to explain the holding in *Johnson* in some detail. In that case, Harrah's Kansas Casino Corporation ("Harrah's") had urged the district court to hold that the plaintiff's claims against it were barred by the doctrine of tribal sovereign immunity. Harrah's operated Harrah's Prairie Band Casino, pursuant to a Management Agreement between Harrah's and the tribe, on property held in trust by the United States for the Prairie Band Potawatomi Nation. *Johnson*, 2006 WL 463138, at *2. Under that agreement, Harrah's conducted the casino's daily operations and the tribe received the total net revenue from the casino; in return, the tribe paid Harrah's a management fee. *Id*. The *Johnson* court concluded that Harrah's was not a tribal housing authority or a tribal agency and that it therefore needed to determine whether Harrah's "[wa]s a 'subordinate economic organization' of the Tribe." *Id*. at *4. The court then explained that

> [m]ost courts addressing the issue have considered some or all of the following factors: (1) the announced purpose for which the entity was formed; (2) whether the entity was formed to manage or exploit specific tribal resources;

21

(3) whether federal policy designed to protect Indian assets and tribal cultural autonomy is furthered by the extension of sovereign immunity to the entity; (4) whether the entity is organized under the tribe's laws or constitution rather than federal law; (5) whether the entity's purposes are similar to or serve those of the tribal government; (6) whether the entity's governing body is comprised mainly of tribal officials; (7) whether the tribe has legal title or ownership of property used by the entity; (8) whether tribal officials exercise control over the administration or accounting activities of the organization; (9) whether the tribe's governing body has power to dismiss members of the organization's governing body, and (10) whether the entity generates its own revenue, whether a suit against the entity would impact the tribe's fiscal resources, and whether it may bind or obligate tribal funds.

*Id.* The *Johnson* court decided to apply those factors to determine whether the economic entity at issue was entitled to tribal immunity. Significantly, however, it decided to treat the tenth factor, the financial relationship between the entity and the tribe and whether a judgment against the entity would affect tribal assets, as a threshold determination, just as the Supreme Court of Alaska did in *Runyon ex. rel. B.R. v. Association of Village Council Presidents*, 84 P.3d 437 (Alaska 2004). The *Johnson* court agreed with *Runyon*'s determination that

[w]hen considering whether an entity is an arm of the tribe for purposes of tribal sovereign immunity, . . . "the entity's financial relationship with the tribe is . . . of paramount importance—if a judgment against it will not reach the tribe's assets or if it lacks the 'power to bind or obligate the funds of the [tribe],' it is unlikely that the tribe is the real party in interest." On the other hand, . . . the entity may be an arm of the tribe if it would be legally responsible for the entity's obligations.

*Johnson*, 2006 WL 463138, at \*5 (quoting *Runyon*, 84 P.3d at 440–41).

The district court in *Johnson* therefore first examined "the financial relationship between the Tribe and Harrah's" to determine if Harrah's was entitled to share in the tribe's sovereign immunity. *Id*. "If the Tribe may be financially liable for Harrah's legal obligations, the Court w[ould then] proceed to discuss [the] other factors pertaining to the purpose and control of Harrah's." *Id*. The court concluded that it was not clear whether a judgment against Harrah's would reach the tribe's assets and so proceeded to analyze the remaining factors, ultimately concluding that the balance of the factors "militate[d] against extending tribal sovereign immunity to . . . Harrah's." *Id*. at \*6, \*8.

In applying *Johnson*, the district court in this case concluded that the Authority and the Casino could not satisfy the threshold inquiry; it determined as a dispositive matter that a judgment against the Authority or the Casino would not endanger the Tribe's right to receive profits. On that basis, the court held that those entities were not entitled to tribal sovereign immunity and declined to reach the remaining *Johnson* factors. We conclude that the district court applied the wrong legal standard to determine whether the Authority and the Casino are entitled to tribal sovereign immunity.

Our recent decision in *Native American Distributing* reveals the district court's error. In that case, we were asked to decide whether the Seneca-Cayuga Tobacco Company, or "SCTC," an enterprise of the Seneca-Cayuga Indian Tribe,

23

was entitled to sovereign immunity. That question in turn depended upon whether SCTC was a division of the tribal corporation, which had waived its immunity from suit, or of the tribe, which had waived its immunity only as to actions of the tribal corporation. *Native Am. Distrib.*, 546 F.3d at 1293. To answer that question, we examined the tribe's business committee resolution that created SCTC.

We determined that "SCTC was a division of the Tribe" based on the following facts: the resolution's invocation of the business committee's powers under the tribal constitution rather than its powers under the corporate charter, thereby "lend[ing] support to the conclusion that SCTC was created by the Tribe acting in its governmental, rather than corporate, capacity"; the resolution's express declaration that SCTC would act as an economic development project to provide economic opportunities and revenue for the tribe, and its statement that SCTC was an essential governmental function of the tribe; and the resolution's inclusion of an express waiver of immunity as to suits brought by a specific management company, indicating that the business committee believed SCTC was a division of the tribe that otherwise was entitled to tribal immunity. *Id.* at 1293–94. We therefore looked to the purpose of the entity, whether it was created under tribal law, and whether the tribe intended for the entity to have tribal immunity.

The most important lesson for our purposes that we glean from *Native*

24

*American Distributing* is found in what we did *not* consider—in that case, we did not examine the financial relationship between SCTC and the tribe and whether a judgment against SCTC would reach the tribe's monetary assets, much less designate that factor as a threshold determination.  Although we recognize that the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship, *Native American Distributing* plainly demonstrates that it is *not* a dispositive inquiry.  The district court's decision to treat it as such was error.

We therefore must determine the correct legal standard.  At this time there is no need to define the *precise* boundaries of the appropriate test to determine if a tribe's economic entity qualifies as a subordinate economic entity entitled to share in a tribe's immunity.  In this case, we conclude that the following factors are helpful in informing our inquiry: (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities.[10]  *See, e.g.*, *Allen*, 464 F.3d at

_____

[10]    As the district court in the Western District of Oklahoma commented, "[a]lthough the subordinate economic entity analysis has been widely adopted, its implementation is rarely uniform." *Somerlott v. Cherokee Nation Distribs. Inc.*, No. CIV-08-429-D, 2010 WL 1541574, at *3 (W.D. Okla. Apr. 16, 2010); *see also Gavle*, 555 N.W.2d at 293 (stating that "the demarcation between those business entities so closely related to tribal governmental interests as to benefit

(continued...)

1046–47; *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812 (7th Cir.

1993); *Gavle*, 555 N.W.2d at 294–95; *Ransom v. St. Regis Mohawk Educ. &

Cmty. Fund, Inc.*, 658 N.E.2d 989, 992–93 (N.Y. 1995); *Dixon*, 772 P.2d at

1109–11; *Trudgeon v. Fantasy Springs Casino*, 84 Cal. Rptr. 2d 65, 67–72 (Cal.

Ct. App. 1999); Vetter, *supra*, at 176–79; *cf. Dillon*, 144 F.3d at 583 (evaluating

whether tribal housing authority was a corporation created by the tribe and

subject to suit).  Furthermore, our analysis also is guided by a sixth factor: the

policies underlying tribal sovereign immunity and its connection to tribal

economic development, and whether those policies are served by granting

immunity to the economic entities.  *See Dixon*, 772 P.2d at 1111 ("Tribal

immunity should only apply when doing so furthers the federal policies behind

the immunity doctrine." (citing Note, *Tribal Sovereign Immunity: Searching for

Sensible Limits*, 88 Colum. L. Rev. 173, 183, 186 (1988))); *Gavle*, 555 N.W.2d at

294 (courts should determine "whether federal policies intended to promote

--------

[10](...continued)
from the tribe's sovereign immunity and those so far removed as to be treated as
mere commercial enterprises is not as clear" and that "'whether tribal sovereign
immunity now extends to commercial activities is an important, complex and
unresolved question,' which the U.S. Supreme Court has never directly
considered" (quoting *In re Greene*, 980 F.2d 590, 600–01 (9th Cir. 1992))).
Accordingly, we have looked to the various tests used by federal courts, as well
as state courts, and have identified factors we believe to be most helpful in this
particular instance.  We have *not* concluded that those factors constitute an
exhaustive listing or that they will provide a sufficient foundation in every
instance for addressing the tribal-immunity question related to subordinate
economic entities.

Indian tribal autonomy are furthered by the extension of immunity to the business entity"). Those policies include protection of the tribe's monies, *see Cabazon Band of Mission Indians*, 480 U.S. at 218–19; *Allen*, 464 F.3d at 1046–47, as well as "preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians," *Dixon*, 772 P.2d at 1111. We will therefore consider these factors in determining whether the Authority and the Casino are subordinate economic entities of the Tribe and entitled to share in the Tribe's sovereign immunity.

### 2. Whether the Authority and the Casino are entitled to share in the Tribe's sovereign immunity.

#### a. BMG's challenge to the district court's discovery and evidentiary rulings.

Before we evaluate those factors, we first must address BMG's argument that the district court abused its discretion in denying its request for discovery and in preventing BMG from calling what it deemed to be necessary witnesses. If we were to conclude that the district court did abuse its discretion in limiting jurisdictional discovery, we likely would remand the matter for discovery and further factual development.

BMG moved in the district court for leave to conduct limited discovery on the issue of tribal sovereign immunity. The court denied the motion, expressing its concern that discovery would undermine the purposes behind the immunity doctrine. But the district court did permit the parties to subpoena documents and

witnesses. Consequently, the evidence upon which the district court based its denial of Defendants' motion to dismiss consisted of documents introduced by the Authority and the Casino at the evidentiary hearing (with an admissibility stipulation from BMG), testimony by the tribal chairperson, Dustin Graham, and the stipulated agreed-upon facts filed by the parties. BMG argues that "the denial of discovery prejudiced BMG because . . . BMG could only utilize documents that the [Authority and the Casino] 'cherry picked' in the belief they would support their case." Aplee. Answer Br. & Opening Br. at 54. Additionally, BMG argues it was prejudiced by not being allowed to call as witnesses two individuals it had subpoenaed—Jeff Livingston, the Casino's general manager, and Dixie Jackson, the former chairperson of the Authority. Those witnesses did not appear at the hearing. BMG asserts that Mr. Graham did not have the same amount of knowledge about the Authority and the Casino as the witnesses it would have liked to examine.

Because a 12(b)(1) motion is "a 'speaking motion' and can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion," the district court "ha[d] wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts under 12(b)(1)." *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987); *accord Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). "If . . . the court holds an evidentiary

28

hearing to adjudicate the issue of whether the court has jurisdiction . . . , the court determines the credibility of witness testimony, weighs the evidence, and finds the relevant jurisdictional facts." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010).

As with the court's handling of discovery in other stages of litigation, in the context of a 12(b)(1) motion, "[w]e give the district court much room to shape discovery," *Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 225 (D.C. Cir. 2009), and review the district court's handling of jurisdictional discovery under an abuse-of-discretion standard, *Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009). *See also Trentadue v. F.B.I.*, 572 F.3d 794, 806 (10th Cir. 2009). Similarly, we review the court's evidentiary rulings, including the court's decision to exclude evidence or testimony, for abuse of discretion. *See La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1180–81 (10th Cir. 2009); *Polys v. Trans-Colo. Airlines, Inc.*, 941 F.2d 1404, 1407–08 (10th Cir. 1991). "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Trentadue*, 572 F.3d at 806 (quoting *Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 866 (10th Cir. 2009)) (internal quotation marks omitted).

We are not persuaded that the district court abused its discretion in this case. We have held that "a refusal to grant [jurisdictional] discovery constitutes

29

an abuse of discretion if the denial results in prejudice to a litigant" and that "[p]rejudice is present where 'pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary.'" *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.3d 406, 430 n.24 (9th Cir. 1977)). BMG has failed to convince us of its legal entitlement to jurisdictional discovery and, more specifically, that it was prejudiced by the district court's denial of its motion for discovery.[11] First, BMG

---

[11] Our research reveals that we previously have placed the burden of demonstrating a legal entitlement to jurisdictional discovery—and the related prejudice flowing from the discovery's denial—on the party seeking the discovery; but we have done so only in unpublished, non-binding cases. *See, e.g.*, *Xie v. Univ. of Utah*, 243 F. App'x 367, 375–76 (10th Cir. 2007) (holding in the Rule 12(b)(1) context that the movant had failed to establish that the court's denial of her request for jurisdictional discovery had prejudiced her); *cf. United States v. Cervantes*, 267 F. App'x 741, 744 n.2 (10th Cir. 2008) (in denying a request for a COA for a § 2255 motion, stating that the petitioner "never renewed his motion [for discovery and an evidentiary hearing], so the responsibility for this outcome lies with him"). We are persuaded by those cases. We also note that placing the burden on the party that has sought jurisdictional discovery is in accord with the general approach of at least three other circuits—the Fifth, Seventh, and Ninth Circuits. *See Freeman v. United States*, 556 F.3d 326, 341–42 (5th Cir.), *cert. denied*, 130 S. Ct. 154 (2009); *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008); *Searls v. Glasser*, 64 F.3d 1061, 1068–69 (7th Cir. 1995). Requiring the party challenging the denial of jurisdictional discovery to prove prejudice is particularly fitting when a party has challenged the district court's subject matter jurisdiction on immunity grounds. In that context, we have concerns about burdening the potentially sovereign party with discovery, as the district court in this case recognized. *Cf. Freeman*, 556 F.3d at 341 (in discussing the burden the Fifth Circuit places on a party seeking discovery on summary judgment to show that discovery is necessary, stating that "[t]his is particularly true where the party seeking discovery is attempting to disprove the applicability

(continued...)

30

did not renew its motion for discovery at the evidentiary hearing.  That alone makes us inclined to find that BMG bears the responsibility for any purported evidentiary deficiencies at the hearing and effectively forfeited its challenge.  But there is more.

At the evidentiary hearing, BMG stipulated to the admissibility of approximately seventy-one exhibits.  Counsel for BMG then essentially conceded that BMG had not been prejudiced by the lack of discovery.  Not only did counsel express a desire to go forward with the hearing, but in response to the district court's inquiry about the missing witnesses, counsel stated that, based solely on the evidence presented at the hearing, he was "confident . . . that the Court will see how the documents at hand, in particular one document, . . . establishes this case."  Aplee. Supp. App. at 123.

Furthermore, BMG does not tell us what specific documents it would have sought in discovery.  Nor does BMG offer any support for its claim that the Authority and the Casino "cherry picked" documents they believed were

---

[11](...continued)
of an immunity-derived bar to suit because immunity is intended to shield the defendant from the burdens of defending the suit, including the burdens of discovery"); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992) (discussing tension between discovery and protecting a sovereign's legitimate claim to suit and stating that "[a]t the very least, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination"); *cf. also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (noting that one purpose of resolving qualified immunity early in the litigation is "to avoid subjecting government officials . . . to the burdens of broad-reaching discovery" (alteration omitted) (internal quotation marks omitted)).

31

favorable to their claim of tribal immunity. *See Freeman*, 556 F.3d at 342 ("The party seeking discovery typically . . . alleg[es] the 'specific facts crucial to immunity which demonstrate[] a need for discovery.'" (second alteration in original) (quoting *Kelly v. Syria Shell Petroleum Co. B.V.*, 213 F.3d 841, 852 (5th Cir. 2000))); *Boschetto*, 539 F.3d at 1020 (holding that the district court's denial of a request for jurisdictional discovery was not an abuse of discretion where the request "was based on little more than a hunch that it might yield jurisdictionally relevant facts"); *cf. Garcia v. U.S. Air Force*, 533 F.3d 1170, 1179 (10th Cir. 2008) ("A party may not invoke Rule 56(f) 'by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion.'" (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1308–09 (10th Cir. 2007))). Indeed, BMG's conclusory assertion that jurisdictional discovery was necessary seems almost like an attempt to "use discovery as a fishing expedition" rather than to obtain needed documents to defeat the tribal immunity claim. *Anthony v. United States*, 667 F.2d 870, 880 (10th Cir. 1981).

We also fail to see how the district court abused its discretion in effectively preventing BMG from examining certain witnesses.[12] At the evidentiary hearing,

---

[12] It is not entirely clear from the record whether the district court took an affirmative action that amounted to a ruling that BMG was not permitted to call Mr. Livingston and Ms. Jackson. BMG's counsel objected to the witnesses' absence, and the district court permitted him to make a proffer as to their

(continued...)

when asked to make a proffer as to what those witnesses' testimony would have been, counsel was unable to explain how Mr. Livingston's or Ms. Jackson's testimony would have differed from Mr. Graham's. *Cf. Polys*, 941 F.2d at 1406–11 (finding that the district court did not err in excluding deposition testimony because plaintiffs did not make an offer of proof). And BMG does not explain on appeal what the value of the missing witnesses' testimony would have been, particularly in light of the fact that BMG had the opportunity to examine a higher-ranked tribal official, the tribal Chairperson. BMG offers no support for its conclusory assertion that Mr. Graham was not as knowledgeable as the missing witnesses about the Authority and the Casino. Because we conclude that the district court did not abuse its discretion in its denial of jurisdictional discovery, we will therefore proceed to determine whether the facts support the Authority and the Casino's claim that they are subordinate economic entities entitled to tribal sovereign immunity.

---

[12](...continued)
probable testimony. Counsel stated that he "c[ould ]not say how Mr. Livingston would testify differently [than] Mr. Graham." Aplee. Supp. App. at 149. The court never made an explicit ruling, but we conclude that the court must have decided tacitly that it would not allow BMG to call those witnesses at a later date because it then heard closing arguments and issued a ruling without comment. We will therefore analyze BMG's challenge under the assumption that the district court denied BMG the opportunity to call those witnesses.

**b. Whether the Authority and the Casino are subordinate economic entities that share in the Tribe's sovereign immunity.**

As we have stated, we will review the record in light of the following factors: (1) the method of the Authority and the Casino's creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the Tribe has over the entities; (4) whether the Tribe intended for them to have tribal sovereign immunity; (5) the financial relationship between the Tribe and the Authority and the Casino; and (6) whether the purposes of tribal sovereign immunity are served by granting them immunity.[13]

---

[13] Although the district court did not evaluate all of these factors because it erroneously concluded that the financial relationship between the Tribe and the Authority and the Casino was dispositive, we do not choose to remand this case for the district court to weigh them in the first instance. Because these factors were part of the *Johnson* test, the district court received evidence sufficient for us to evaluate these factors on appeal. Moreover, because the balance of the factors weighs so strongly in favor of immunity—as we discuss *infra*—it would be an imprudent allocation of judicial resources to remand this matter.

We also note that in evaluating these factors, we need not decide whether the Authority and the Casino are located on Indian lands. BMG vigorously argues that they are not, contending that their purported location outside of Indian land undermines their claim that their operations further tribal economic development and self-determination. *See* Aplee. Answer & Opening Br. at 29 ("While the Resort Parties argue that granting immunity will promote 'tribal economic development, self sufficiency, and strong tribal governments,' they do not address how compelling a separate business entity that operates outside of 'Indian Lands' to comply with U.S. copyright and trademark laws will weaken its government, cause it to be less self-sufficient, or will impact its economic development." (quoting Aplts. Opening Br. at 12)). However, this factor did not appear to be a significant one to the *Native American Distributing* court; it did not discuss

(continued...)

34

The first factor, the method of creation of the Authority and the Casino, weighs in favor of the conclusion that these entities are entitled to tribal sovereign immunity. The parties stipulated that the Tribe created the Authority under tribal law. It is also evident from our review of the tribal resolution creating the Authority that the Tribe created those entities under its constitution. As in *Native American Distributing*, "[t]his lends support to the conclusion that [the Authority] was created by the Tribe acting in its governmental . . . capacity." 546 F.3d at 1294. We also find the Tribe's own descriptions of the Authority to be significant. The resolution described the Authority as "a body corporate and politic and an instrumentality of the Tribal Government and an authorized agency of the Tribe." Aplts. App. at 126. That same language was used in the ordinance establishing and governing the Authority, which originally provided that the "Authority is and shall be considered a body corporate and politic and instrumentality of the Picayune Rancheria of Chukchansi Indians . . . and shall be deemed an authorized agency of the Tribe." *Id*. at 129. That provision was later

---

[13](...continued)
whether SCTC was located on Indian lands. Consequently, we do not feel obliged to give it independent consideration in our tribal immunity analysis here. Furthermore, even if the Authority and the Casino were not located on Indian land, we suspect that this fact would not avail BMG in the tribal immunity analysis. *See Kiowa Tribe of Okla.*, 523 U.S. at 758 (rejecting the invitation to "confine it [i.e., the doctrine of tribal sovereign immunity] *to reservations* or to noncommercial activities" (emphasis added)); Cohen, *supra*, § 21.02[2] at 1285 ("Tribal sovereign immunity extends to *off-reservation activities* of the tribe and applies to both governmental and commercial activities." (emphasis added)).

amended to describe the Authority as "a wholly owned unincorporated enterprise of the Tribe [which] shall be deemed an authorized agency of the Picayune Rancheria of Chukchansi Indians." *Id.* at 135. We agree with the Authority and the Casino that the change in terminology seems intended to remove the reference to them as "corporate" entities and, consequently, to emphasize that they are subordinate entities of the Tribe and not separate corporations. And the categorization of the Authority as "a wholly owned . . . enterprise of the Tribe" naturally suggests that the Authority enjoys a close relationship to the Tribe.

The second factor also weighs strongly in favor of immunity because the Authority and the Casino were created for the financial benefit of the Tribe and to enable it to engage in various governmental functions. The resolution states that "the Tribal Council has determined that it is in the best interests of the members of the Tribe for the Tribe to conduct Class II and Class III gaming."[14] Aplts. App.

---

[14]     We acknowledge that the IGRA provides for the creation and operation of Indian casinos to promote "tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Moreover, one of the principal purposes of the IGRA is "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." *Id.* § 2702(2). But we decline to adopt a blanket rule proposed by the Authority and the Casino that "the IGRA dictates that the Authority and the Casino must be considered tribal entities protected from suit under the doctrine of tribal immunity." Aplts. Opening Br. at 14. The purposes of Indian gaming certainly are relevant to our analysis, and the fact that gaming is both generally intended to benefit the tribe and is in this case used to fund the Tribe's governmental functions weighs in favor of immunity. *See Gavle*, 555 N.W.2d at 295 (recognizing "the unique role that Indian gaming serves in the economic life of here-to-fore impoverished Indian communities across this country"). But it is equally true that some casinos are run by

(continued...)

36

at 126. It also states that "the Tribal Council has determined that it is in the best interest of the Tribe and its members to create a Tribal Economic Development Authority as a body corporate and politic and an instrumentality of the Tribal Government and an authorized agency of the Tribe to develop and own the Casino . . . and to manage all assets and revenues" of the Casino. *Id.* Similarly, the tribal ordinance states that the "Authority . . . is created by the Tribal Council to act on behalf of the Tribe . . . for the following purposes," including "further[ing] the economic prosperity of the Tribe." *Id.* at 128.

The allocation of revenue from the Casino clearly benefits the Tribe: 50% goes to tribal governmental functions, including programs such as education, health care, cultural preservation, child care, judicial systems, and law enforcement; 15% is allocated for tribal economic development and is intended to enable the Tribe to diversify in order "to reduce the Tribe's dependancy on revenues from a Gaming Facility"; 10% goes to a tribal trust fund, which "guarantee[s] for the future a basic level of economic security for Tribal families"; and 25% is distributed among each eligible member of the tribe as per

_____

[14](...continued)
management companies, as in *Johnson*, and we are unable to say that in every case, Indian gaming under the IGRA would automatically mean that all economic entities associated with gaming would be sufficiently closely related to the Tribe to share in its sovereign immunity. Although *Native American Distributing* did not involve Indian gaming, that decision nevertheless demonstrates that a multi-factor analysis, rather than a per se rule, is best suited to our examination of the sometimes-complicated relationship between an Indian tribe and its economic entities.

capita payments. *Id.* at 152–53 (Gaming Revenue Allocation Ordinance, adopted Aug. 16, 2007).

In a letter to the Bureau of Indian Affairs dated August 20, 2007, Mr. Graham reiterated that "we believe self-sufficiency is once again within our reach"; he stated that the Tribe would use the Casino's revenue to "encourag[e] our young people to improve their own capacities through education," and indicated that the Tribe "plan[ned] to provide extra care and benefits to our youth and our elders through Tribal programs." Aplts. App. at 146–47. Similarly, a Memorandum of Understanding between the Tribe and the County of Madera, California, states that "the purpose of the [Casino] is to promote the Tribal economic development, self-sufficiency, self-determination, strong Tribal government, and the ability to provide services and benefits to Tribal members." Aplee. Supp. App. at 55. The gaming compact between the Tribe and the State of California contains similar statements about the purpose of the Tribe's engagement in gaming.

The third factor in our analysis, the structure, ownership, and management of the Authority and the Casino, weighs both for and against a finding of immunity. The seven members of the Board of Directors of the Authority are members of the Tribe who also are sitting members of the Tribal Council, which makes the Tribe's Council identical to the Authority's Board. The Chairperson of the Tribe also acts as the Chairperson of the Authority. But the Chief Financial

Officer of the Authority, the General Manager of the Casino, and the Chief Financial Officer of the Casino are not tribal members. Moreover, the Casino has fifteen directors, twelve of whom are not Tribal members.

As for the fourth factor, we conclude that the Tribe clearly intended for the Authority to have tribal sovereign immunity.[15] The tribal ordinance governing the Authority states that the Authority is empowered "[i]n connection with any contractual obligation of the Authority, to waive the Authority's sovereign immunity from suit, to consent to the jurisdiction of any court over the Tribe, or to consent to the levy of any judgment, [or] lien attachment upon any property or income of the Authority." Aplts. App. at 130. The ordinance continues, in a provision labeled "Sovereign Immunity,"

> [a]s a body corporate and politic and instrumentality and authorized agency of the Tribe, the Authority shall be clothed by federal and tribal law with all the privileges and immunities of the Tribe, including sovereign immunity from suit in any state, federal, or tribal court. Nothing contained in this Section shall be deemed or construed to be a waiver of sovereign immunity by

---

[15] It is less clear to us that the Tribe intended for the Casino also to have immunity. But because the Casino is wholly owned by the Authority, it is logical to assume that if the Tribe intended for the Authority to have immunity from suit, it also intended for the Casino to have immunity. Otherwise, a suit against the Casino would be fruitless—the Authority owns all of the Casino's assets and can choose not to waive its own immunity. In their briefs, the Authority and the Casino almost exclusively discuss the Authority and appear to assume that the Casino may be treated similarly to or as a derivative creature of the Authority. Even BMG acknowledges that "[i]t is uncertain if the [Casino] is a separate entity from the Authority." Aplee. Answer & Opening Br. at 13. When asked whether the two were separate, Mr. Graham testified "[p]robably not." Aplee. Supp. App. at 144.

39

the Authority from suit, which may be waived only in accordance with this Section.

*Id*. at 131. That provision was later amended to describe the Tribe as "a wholly owned unincorporated enterprise and agency of the Tribe," but the rest of the language remains the same. *Id.* at 135. The ordinance explicitly waives the Authority's sovereign immunity "in accordance with the terms of the Project and Financing Documents," but as to other instances, it provides that

> [t]he Authority may waive its sovereign immunity when necessary, in the best business judgment of the Board of Directors, to secure a substantial advantage or benefit for the Authority or the Tribe. Any waiver of sovereign immunity shall be specific and limited as to (i) duration, (ii) the grantee, (iii) the scope of the waiver, (iv) nature and description of the property or funds, if any, of the Authority, available to satisfy any order or judgment, (v) a particular court or courts having jurisdiction over the Authority, and (vi) the law that shall be applicable thereto. Any express waiver of sovereign immunity by resolution or contract of the Authority shall not be deemed a waiver of the sovereign immunity of the Tribe.

*Id*. at 131. Accordingly, much like in *Native American Distributing*, the Tribe "clearly expressed its belief that [the Authority] was a division of the Tribe that was entitled to its immunity from suit." 546 F.3d at 1294.

We also find that the fifth factor, the financial relationship between the Tribe and the entities, weighs in favor of tribal sovereign immunity. Significantly, we note that BMG appears to acknowledge that the district court's determination that the Authority was obligated to pay the Tribe a minimum payment of $1 million per month was error. *See* Aplee. Answer Br. & Opening

40

Br. at 12–13, 26 ("It is also important to note that there is no mandatory $1,000,000 payment."). That minimum payment was a key fact that the district court relied upon in its analysis.

In denying the Authority and the Casino's motion to dismiss, the district court stated that "the Authority is obligated to pay over to the Tribe at least $1 million per month, regardless of its actual revenues." Aplts. App. at 46. Therefore, the court reasoned, "should the actual profits fall short, the Authority will borrow or run a deficit to ensure that the Tribe receives that which it is entitled to," *id*. at 47, and, as a consequence, "the judgment would neither deprive the Tribe of its asset—the right to receive profits—nor its guaranteed minimum payment," *id*. at 48.

However, Mr. Graham testified at the evidentiary hearing that if the Authority did not have the funds to cover the payment due to a decrease in Casino revenue, that payment "wouldn't happen." Aplee. Supp. App. at 147–48. Furthermore, an auditor's report explains the "minimum guaranteed monthly payment" as follows: "[T]he monthly payments to the Tribe from the Casino *may* be *up to* $1,000,000 per month cumulatively . . . ." *Id*. at 85 (emphasis added). Moreover, "the Authority introduced exhibits at the Evidentiary Hearing that reveal that it has previously failed to pay the Tribe the alleged mandatory $1,000,000 monthly payment for a number of months without any adverse consequences." Aplee. Answer Br. & Opening Br. at 26 (citing Aplee. Supp.

41

App. at 53).  Thus, we conclude from our review of the record that the district court's finding concerning the minimum payment was clearly erroneous.

Keeping that error in mind, the evidence reveals that the Tribe depends heavily on the Casino for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities. One hundred percent of the Casino's revenue goes to the Authority and then to the Tribe.  Therefore, as Mr. Graham testified, any reduction in the Casino's revenue that could result from an adverse judgment against it would therefore reduce the Tribe's income.

And, finally, we conclude that the sixth factor, the overall purposes of tribal sovereign immunity, is served by a conclusion that the Authority and the Casino have such immunity.  They are so closely related to the Tribe that their "activities are properly deemed to be those of the tribe."  *Allen*, 464 F.3d at 1046. The Authority and the Casino plainly promote and fund the Tribe's self-determination through revenue generation and the funding of diversified economic development.  *See, e.g.*, *Cabazon Band of Mission Indians*, 480 U.S. at 218–19; *Allen*, 464 F.3d at 1046–47; *Gavle*, 555 N.W.2d at 294–95; *Trudgeon*, 84 Cal. Rptr. 2d at 70.  Not only has "Congress . . . expressed a strong policy in favor of encouraging tribal economic development," Note, *Tribal Sovereign Immunity: Searching for Sensible Limits*, *supra*, at 186, but extending immunity to the Authority and the Casino "directly protects the sovereign Tribe's treasury,

which is one of the historic purposes of sovereign immunity in general," *Allen*, 464 F.3d at 1047. In comparison, "[c]ases which have not extended immunity to tribal enterprises typically have involved enterprises formed 'solely for business purposes and without any declared objective of promoting the [tribe's] general tribal or economic development.'" *Trudgeon*, 84 Cal. Rptr. 2d at 70 (alteration in the original) (quoting *Dixon*, 772 P.2d at 1110).

After considering these factors, it is patent to us that the Authority and the Casino are so closely related to the Tribe that they should share in the Tribe's sovereign immunity. Under these circumstances, we must conclude that the district court clearly erred in finding that the Authority and the Casino were not subordinate economic entities entitled to tribal sovereign immunity.[16] We

---

[16] We are not persuaded otherwise by the portions of the ordinance that the district court found so compelling. For example, the district court discussed the provision in the ordinance that states that the Authority shall be exempt from taxes "to the same extent as the Tribe, and for such purposes shall not be deemed to be an entity or enterprise taxable separate from the Tribe." Aplts. App. at 138. That provision goes on to say that "[f]or all other purposes of the [Casino], its ownership and operation, the Authority shall be considered a separate entity." *Id.* at 139. The district court also relied upon liability-limiting language in the ordinance, which reads: "For the purposes of all liabilities and obligations incurred in the name of the Authority or arising from the Authority's ownership or operation of the [Casino], the Authority shall constitute a separate entity, and no other Tribal Party shall be obligated thereon except as such party may otherwise expressly agree." *Id.* Those provisions merely demonstrate that the Authority and the Casino are not the Tribe itself, but are separate entities. Other provisions demonstrate that fact, as well—for example, the ordinance provides that the Authority's waiver of sovereign immunity waives it only as to the Authority and does not necessarily waive the Tribe's immunity. *See id.* at 131 ("Any express waiver of sovereign immunity by resolution or contract of the
(continued...)

43

consequently reverse the district court's denial of the motion to dismiss; the Authority and the Casino (and thus Mr. Stanley) are protected from suit by tribal sovereign immunity.

Therefore unless they have waived their immunity,[17] the complaint against the Authority, the Casino, and Mr. Stanley should be dismissed for lack of subject matter jurisdiction. Because the district court concluded that the Authority and the Casino were not entitled to tribal sovereign immunity, it did not address BMG's alternative argument—*viz.*, that those entities had waived whatever immunity they possessed by entering into BMG's licensing agreements containing forum-selection clauses. We conclude that the most prudent course is to remand the case for the district court to address waiver in the first instance. *See*

---

[16](...continued)
Authority shall not be deemed a waiver of the sovereign immunity of the Tribe."). But that does not change our sovereign immunity analysis. The Authority and the Casino may, as subordinate economic entities, share in the Tribe's immunity without being the same as, or indistinguishable from, the Tribe. If that were not true, there would be no need for the subordinate economic enterprise doctrine. Even if we assume *arguendo* that those provisions should weigh against a finding of immunity in our analysis, they cannot outweigh the balance of factors that weigh in favor of immunity.

We also are not convinced by BMG's contention that the Authority and Casino's insurance policies protect the Tribe from being financially responsible for, or harmed by, an adverse judgment against them, and weigh against a finding of immunity. Even if the insurance policies would provide coverage in this instance, which is far from certain, we would nevertheless conclude that this fact does not outweigh the balance of the other factors in favor of immunity.

[17]     BMG does not contend that Congress has abrogated the immunity of these entities.

44

*Apartment Inv. & Mgmt. Co. (AIMCO) v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1198 (10th Cir. 2010) (recognizing that the "better practice" is to remand issues raised but not ruled on by the district court in the first instance).

## II.    BMG's "Protective" Cross-Appeal

BMG also raised the issue of waiver in what it calls a "protective" cross-appeal. Specifically, BMG cross-appealed "to preserve, as an additional or alternative basis for affirming that portion of the District Court's order of August 6, 2008[,] finding that Appellants could not invoke tribal sovereign immunity, the issue that Appellants also waived any claim of tribal sovereign immunity by executing the two license agreements with Breakthrough Management." Aplee./Cross-Aplt. Mem. Br. Jurisdiction, Attach. BMG0093 (Notice of Protective Cross-Appeal, filed Sept. 3, 2008). BMG argues that this court should exercise pendent appellate jurisdiction over its cross-appeal because the issue of waiver is "inextricably intertwined" with the Appellants's interlocutory appeals. Aplee./Cross-Aplt. Mem. Br. Jurisdiction at 18–19. BMG contends that there is a single issue at stake: "whether Appellants are entitled to assert tribal sovereign immunity as a defense." *Id*. at 18.

BMG states in the alternative that "[e]ven if the claims . . . *were not* 'inextricably intertwined,' pendent jurisdiction still would be appropriate here, because review of the cross-appeal is necessary to ensure meaningful review of Appellants' claims of tribal sovereign immunity." *Id*. at 19. BMG maintains that

45

if its argument regarding waiver is later found to be correct on subsequent appeal, that would render this court's review of the instant appeal meaningless. *Id*. BMG also contends that the only way it could raise the issue of waiver is through a cross-appeal because it "asks the Court to affirm on grounds that might enlarge the rights afforded the prevailing party" (i.e., the Tribe may be affected by this court's ruling that the parties to this appeal had waived any sovereign immunity they possessed). *Id*. at 13,16.

We are unpersuaded. We conclude that it would be improper for us to exercise pendent jurisdiction over BMG's cross-appeal. "We have recognized that the exercise of pendent appellate jurisdiction 'is generally disfavored.'" *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1200 (10th Cir. 2002) (quoting *Armijo ex. rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1264 (10th Cir. 1998)). "This court has stated it will take pendant [sic] jurisdiction over an interlocutory appeal only where the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one." *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 915 (10th Cir. 2008) (quoting *Timpanogos Tribe*, 286 F.3d at 1200) (internal quotation marks omitted); *see United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999) (noting that the exercise of pendent jurisdiction is discretionary and should be used sparingly); *Armijo*, 159 F.3d at 1264 (same).

46

Issues are inextricably intertwined if "the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995); *see Malik v. Arapahoe Cnty. Dept. of Social Servs.*, 191 F.3d 1306, 1317 (10th Cir. 1999) ("Accordingly, our application of the 'inextricably intertwined' standard for exercising pendent jurisdiction over interlocutory appeals must be narrowly focused on those claims the review of which would *not* require the consideration of legal or factual matters distinct from those raised by the claims over which we unquestionably have jurisdiction." (emphasis added)).

As clearly evident from our decision to remand the issue of waiver to the district court, *supra*, we do not view the waiver issue as being inextricably intertwined with the question of whether the Authority and the Casino share in the Tribe's sovereign immunity. Our decision concerning the latter issue does not "necessarily resolve[] the pendent [waiver] claim as well." *Moore*, 537 F.3d at 930. The immunity and waiver issues are distinct. *See Sac & Fox Nation v. Hanson*, 47 F.3d 1061, 1064 (10th Cir. 1995) ("[I]f the Nation was entitled to sovereign immunity, it did not waive its immunity from suit. We must therefore address the predicate question of whether the Nation had sovereign immunity in the first instance."); *see also Gonzalez v. 7th St. Casino*, No. 09-2674-CM, 2010 WL 1875734, at *2 (D. Kan. May 5, 2010) ("Whether an entity is entitled to tribal

47

sovereign immunity to begin with is a separate issue from whether immunity has been waived."); *Bales v. Chickasaw Nation Indus.*, 606 F. Supp. 2d 1299, 1305–06 (D.N.M. 2009) (as to that case, noting that "waiver is not an issue but rather the issue is whether there is tribal sovereign immunity to begin with").  Our resolution of the former issue (i.e., the availability of tribal sovereign immunity) involves consideration of the relationship between the Tribe and the Authority and the Casino, whereas our resolution of the latter (i.e., waiver of any tribal sovereign immunity) calls for consideration of the effect of the forum-selection clauses of the license agreements.  *See* Aplts./Cross-Aplees. Mem. Br. Jurisdiction at 10 ("[T]he appeal only requires the Court to examine the relationship between Appellants and the Tribe.  The effect, if any, of BMG's license agreement is a separate claim under a separate legal theory.").  Furthermore, our decision concerning sovereign immunity will stand as meaningful precedent involving complicated Indian-law issues, irrespective of the ultimate conclusion concerning waiver before the district court or in any subsequent appeal.

BMG is free to litigate the waiver issue before the district court and to appeal from an adverse ruling on this issue.  BMG's suggestion that it must raise this issue on cross-appeal because of the possible impact of a waiver ruling on the

Tribe's claim of immunity is misguided.[18]  A cross-appeal ordinarily would be

appropriate where a litigant seeks to enlarge his rights conferred by the original

judgment or to lessen the rights of his adversary under that judgment.  *United*

*States v. Am. Ry. Exp. Co.*, 265 U.S. 425, 435 (1924) ("[T]he appellee may not

---

[18]     In making this argument, BMG relies upon our decision in *Housing Authority of Kaw Tribe of Indians of Oklahoma v. City of Ponca City*, 952 F.2d 1183 (10th Cir. 1991).  Specifically, BMG contends that "the Tenth Circuit has warned that filing a cross-appeal is necessary when resolution of an issue potentially diminishes the rights of absent third parties."  Aplee./Cross-Aplt. Mem. Br. Jurisdiction at 20.  *Housing Authority of Kaw Tribe*, however, is distinguishable.  There, we rejected the city defendant's contention that we should affirm on the alternative ground of res judicata because the city failed to file a cross-appeal.  In particular, we stated: "Were we to affirm the original judgment on the basis of res judicata, other potential plaintiffs having some relationship with the Authority might unfairly be precluded from bringing claims against Ponca City."  *Hous. Auth. of Kaw Tribe*, 952 F.2d at 1195.  It is significant, however, that the alternate ground for affirmance advanced in *Housing Authority of Kaw Tribe* was res judicata.  As the Supreme Court decision that we relied upon there indicates, "[u]nder res judicata, a final judgment on the merits bars further claims by parties *or their privies* based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979) (emphasis added).  If we were to affirm the district court's sovereign immunity order under a waiver rationale, the Tribe—not subject to the terms of that order nor a party to this appeal—would not necessarily and unfairly have its rights lessened by operation of law, as apparently could have been the situation with the potential future litigants in *Housing Authority of Kaw Tribe*.  Relatedly, BMG's rights would not be enlarged necessarily by operation of law by an affirmance on a waiver rationale.  Accordingly, *Housing Authority of Kaw Tribe* is distinguishable.  Be that as it may, perhaps more importantly, we have concluded that the waiver issue is not inextricably intertwined with the tribal immunity issue raised in the principal (interlocutory) appeal.  Therefore, even if BMG could cogently argue that the waiver issue needed to be raised in a cross-appeal because it might enlarge its rights, we have determined that it would not be appropriate for us to exercise pendent jurisdiction over any cross-appeal involving the waiver issue because that issue is not inextricably intertwined.

attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below."); *see June v. Union Carbide Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009) ("Under the cross-appeal rule, 'an appellate court may not alter a judgment to benefit a nonappealing party.'" (quoting *Greenlaw v. United States*, 544 U.S. 237, 244 (2008)).

In the context of an interlocutory appeal, the functional equivalent of the original judgment is the interlocutory order appealed from—*viz.*, in this instance, the district court's order denying sovereign immunity to the Authority and the Casino. *See Behrens v. Pelletier*, 516 U.S. 299, 307 (1996) ("[A]n order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a 'final' judgment subject to immediate appeal."); *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 970 (10th Cir. 2006) ("Although we have jurisdiction over Defendants' appeal from the district court's denial of their motion for summary judgment on qualified immunity, we decline to assert pendent appellate jurisdiction over Defendants' claim that the district court failed to apply a local rule."); *see also* 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3904, at 221 (Supp. 2010) ("Interlocutory appeals may present special challenges in cross-appeal practice. . . . [T]he appeal may properly be confined to matters that relate closely

50

to *the order that supports the appeal*." (emphasis added)).

As the Authority and the Casino correctly note, "BMG's 'right' conferred by that [interlocutory immunity] order is the right to maintain its lawsuit *against these two defendants*." Aplts./Cross-Aplees. Mem. Br. Jurisdiction at 12 (emphasis added). If BMG were successful on its waiver argument, that right would not be enlarged. Accordingly, we decline to assert pendent jurisdiction over BMG's waiver-based cross-appeal, and, accordingly, dismiss it.

## CONCLUSION

For these reasons, we **REVERSE** the district court's orders denying the Authority and the Casino's motion to dismiss and the motion to dismiss of Mr. Stanley, and **REMAND** for further proceedings consistent with this opinion. We **DISMISS** the cross-appeal of BMG for lack of jurisdiction.