# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**478**

**CA 12-01827**

PRESENT: PERADOTTO, J.P., LINDLEY, VALENTINO, AND WHALEN, JJ.

---

SUE/PERIOR CONCRETE & PAVING, INC.,
PLAINTIFF-RESPONDENT,

V                                          OPINION AND ORDER

LEWISTON GOLF COURSE CORPORATION, SENECA
NIAGARA FALLS GAMING CORPORATION, SENECA
GAMING CORPORATION, JEFFREY L. GILL, MARK I.
HALFTOWN, GLORIA HERON, MAURICE A. JOHN, SR.,
MICHAEL L. JOHN, KAREN KARSTEN, INA K. LOCKE,
ROBERT E. MELE, RICHARD K. NEPHEW, MARIBEL
PRINTUP, COCHISE N. REDEYE, GARY SANDEN,
KEVIN W. SENECA, BARRY E. SNYDER, SR., AND
STEVE TOME, DEFENDANTS-APPELLANTS,
NIAGARA COUNTY INDUSTRIAL DEVELOPMENT AGENCY,
DEFENDANT-RESPONDENT,
ET AL., DEFENDANTS.

---

PHILLIPS LYTLE LLP, BUFFALO (MICHAEL BRIAN POWERS OF COUNSEL), AND
HOBBS STRAUS DEAN & WALKER LLP, PORTLAND, OREGON (EDMUND C. GOODMAN,
OF THE OREGON AND WASHINGTON BARS, ADMITTED PRO HAC VICE, OF COUNSEL),
FOR DEFENDANTS-APPELLANTS.

DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP, BUFFALO (GREGORY P. PHOTIADIS
OF COUNSEL), FOR PLAINTIFF-RESPONDENT.

---

Appeal from an order of the Supreme Court, Niagara County
(Catherine Nugent Panepinto, J.), entered March 1, 2012.  The order
denied the motion of defendants-appellants to dismiss the first
amended complaint.

It is hereby ORDERED that the order so appealed from is
unanimously modified on the law by granting the motion of defendants-
appellants in part and dismissing the third cause of action and as
modified the order is affirmed without costs.

Opinion by PERADOTTO, J.:

The central question on this appeal is whether defendant Lewiston
Golf Course Corporation (LGCC), a corporation formed under the laws of
the Seneca Nation of Indians (Nation or SNI), is protected by the
Nation's sovereign immunity.  Contrary to the contention of
defendants-appellants, we conclude that Supreme Court properly denied
that part of their motion seeking to dismiss the first amended

complaint against LGCC on sovereign immunity grounds inasmuch as LGCC is not an "arm of the tribe" for purposes of sovereign immunity. We conclude, however, that the court should have granted that part of their motion seeking to dismiss the third cause of action, and thus that the order should be modified accordingly.

I

This matter arises out of the construction of the Hickory Stick Golf Course on a parcel of vacant land in the Town of Lewiston, New York. Defendant Seneca Niagara Falls Gaming Corporation (SNFGC) purchased the 250-acre parcel in 2006 from a private party on the open market for $2.1 million. SNFGC is a wholly-owned subsidiary of defendant Seneca Gaming Corporation (SGC), which, in turn, is wholly owned by the Nation. In July 2007, SNFGC conveyed the parcel to LGCC, a wholly-owned subsidiary of SNFGC created for the purpose of developing and operating a golf course on the property. SGC, SNFGC, and LGCC are all "corporation[s] . . . duly formed under the laws of [SNI]." The Nation's legislative body, the Council, appoints the members of SGC's board of directors, and the boards of SNFGC and LGCC are comprised "solely of the members of the board of directors of [SGC]."

In August 2007, LGCC contracted with plaintiff to construct an "18-hole championship golf course with an associated driving range, club house and pro shop" on the Lewiston property for the sum of $12.7 million. In connection with the project, LGCC applied for and received over $1 million in tax breaks through agreements with defendant Niagara County Industrial Development Agency (NCIDA). The project had a substantial completion date of November 30, 2008, but it was not completed until December 2, 2009. Upon the completion of construction, plaintiff claimed that LGCC owed it $4.1 million for extra work performed by plaintiff and for delay-related damages. LGCC disputed the sums sought by plaintiff and refused to pay. As a result, plaintiff filed a mechanic's lien against the property in February 2010 and thereafter commenced this action asserting causes of action for foreclosure of the mechanic's lien, breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, promissory estoppel, and fraud. LGCC, SNFGC, SGC, NCIDA, the Niagara Mohawk Power Corporation, and various individuals were named as defendants in the first amended complaint.

Defendants-appellants, i.e., LGCC, SNFGC, SGC, and the individual directors and/or officers thereof (hereafter, defendants), moved to dismiss the first amended complaint against them on sovereign immunity grounds, asserting that they are "entitled to the full protection of the Nation's sovereign immunity, which prevents the [c]ourt from exercising jurisdiction over [them]." They further moved to dismiss the third cause of action, for breach of the implied covenant of good faith and fair dealing, and the sixth cause of action, for fraud, as duplicative of the breach of contract cause of action. In support of the motion, defendants submitted, inter alia, LGCC's bylaws; minutes from an August 2002 Council session enacting the charters of SNFGC and SGC; minutes from a June 2007 Council session approving the creation

of the LGCC; certificates of existence for SNFGC, SGC and LGCC; and LGCC's Charter.

In approving the creation of LGCC, the Council declared that the "economic success of the Nation's gaming operations is vitally important to the economy of the Nation and the general welfare of its members" and that, "in furtherance of the economic success of the Nation's gaming operations, [SNFGC] has commenced development of a . . . golf course located in the Town of Lewiston, New York, including related clubhouse, retail and food and beverage operations, at a total projected cost of up to $20 million."

According to the Council:

> "[T]he Lewiston Golf Course will be developed and operated as an amenity to the SNFGC's casino operations, together with the casino's lodging, dining, retail and entertainment amenities, the purpose of which amenities is to enhance the overall success and profitability of the casino's operations consistent with the powers described in SNFGC's charter and the purposes for which SNFGC was formed . . . [T]he use of a separate corporation or legal entity to own and operate the Lewiston Golf Course is advisable due to various legal and accounting considerations, including the status of the Lewiston Golf Course as an off-territory business venture of the Nation, subject to legal, tax and other requirements that are not applicable to the Nation's on-territory business . . . [T]he Nation desires to establish [LGCC] as a separate legal entity, governmental instrumentality of the Nation, and wholly-owned subsidiary of SNFGC, for the purpose of developing and operating the Lewiston Golf Course in the Town of Lewiston, New York, and legally doing business in such jurisdictions."

The Council therefore authorized and directed SNFGC and LGCC "to develop and implement legitimate tax strategies to minimize any tax obligations of [LGCC], including, but not limited to, maximizing the tax savings benefits offered by [NCIDA]."

LGCC's Charter states that it was "organized for the purpose of developing, constructing, owning, leasing, operating, managing, maintaining, promoting and financing the Lewiston Golf Course on land (currently owned by SNFGC as of the date of this Charter) in the Town of Lewiston, New York." According to the Charter, LGCC is "indirectly owned by the Nation through [SGC] and its wholly-owned subsidiary, SNFGC, and shall constitute a governmental instrumentality of the Nation, having autonomous existence separate and distinct from the Nation." The Charter further provides that "the Nation shall not be liable for the debts or obligations of [LGCC], and [LGCC] shall have no power to pledge or encumber the assets of the Nation."

Plaintiff opposed the motion, contending, inter alia, that LGCC was not entitled to sovereign immunity. In opposition to the motion, plaintiff submitted, inter alia, an October 2007 agent agreement between NCIDA and LGCC; a Payment-in-Lieu of Taxes (PILOT) agreement between NCIDA and LGCC; and a November 2007 lease and leaseback agreement between NCIDA and LGCC. The agreements between NCIDA and LGCC specify that they are governed by and enforced in accordance with the laws of New York State, and that the parties agree to submit to the personal jurisdiction of federal or state courts located in Niagara County, New York. The PILOT agreement provides that "[t]he parties hereto recognize that the purpose of the Project is to create or retain permanent private sector jobs in Niagara County," and that LGCC would be obligated to pay only a portion of its normal tax burden during the five-year term of the agreement.

NCIDA supported that part of defendants' motion seeking to dismiss the third and sixth cause of actions as duplicative of the second cause of action, but opposed the motion insofar as it sought dismissal of the first amended complaint against defendants on sovereign immunity grounds. NCIDA asserted that LGCC, through its predecessor Seneca Management Development Corporation (SMDC), "consistently held [itself] out as a profit making corporation, separate and independent from the [Nation]." According to NCIDA, in applying for tax exemptions and deferrals relative to the golf course project, LGCC did not "imply that it is an arm of the [Nation's] government or that it is entitled to the protections of sovereign immunity. To the contrary, the application shows that the LGCC and the SMDC are separate and independent for[-]profit corporations intended to construct and operate a championship level golf course on non[-] native land to support tourism in the Niagara Region." NCIDA thus contended that "LGCC is not entitled to the protections of sovereign immunity afforded to the [Nation]."

NCIDA submitted, inter alia, an affidavit of its former assistant director, and LGCC's application for assistance in connection with the project. The former assistant director averred that, when SMDC representatives approached NCIDA to secure tax breaks for the golf course project, they indicated "that the land and project would not be considered part of the native territory, but instead would remain on the tax rolls under the jurisdiction of the State of New York." SMDC "also indicated that the land would be owned, and the golf course would be operated, by a for[-]profit corporation independent of [SNI]." According to the former assistant director, SMDC "represented that this project was intended to be a profit making venture outside the compact territories[, and] held [itself] out as a separate and independent profit making corporation." NCIDA granted the project partial real property tax abatements and sales and use tax exemptions for purchases and rentals related to the acquisition, construction and equipping of the golf course, which were worth an estimated $1 million.

In its application for assistance, SMDC stated that it was "looking to create a championship level public/semi-private golf course offering the millions of visitors of the Niagara Falls region

and the patrons of the Seneca Niagara Casino & Hotel a new tourist destination project that will attract golf enthusiasts from Canada and the United States and to capitalize on the growing tourist market, which will create new jobs and allow for prolonged stays in the area." It requested sales tax exemptions of $429,503 and real property tax exemptions of $618,790.

The court denied defendants' motion, concluding, inter alia, that LGCC is not an "arm" of the Nation entitled to sovereign immunity under the factors set forth in *Matter of Ransom v St. Regis Mohawk Educ. & Community Fund* (86 NY2d 553, 558-560). This appeal ensued. Plaintiff has since withdrawn its claims against SGC, SNFGC, and the individual defendants, so only LGCC is at issue on this appeal.

II

It is well settled that "Indian tribes are immune from lawsuits in both state and federal court unless 'Congress has authorized the suit or the tribe has waived its immunity' " (*Warren v United States*, 859 F Supp 2d 522, 539, *affd* 2013 WL 1748957 [2d Cir 2013], quoting *Kiowa Tribe of Okla. v Manufacturing Tech., Inc.*, 523 US 751, 754; *see Breakthrough Mgt. Group, Inc. v Chukchansi Gold Casino & Resort*, 629 F3d 1173, 1182, *cert dismissed* ___ US ___, 132 S Ct 64; *see also Ransom*, 86 NY2d at 558-559). As particularly relevant here, "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation" (*Kiowa Tribe of Okla.*, 523 US at 760; *see Allen v Gold Country Casino*, 464 F3d 1044, 1046, *cert denied* 549 US 1231).

Less settled is the law governing whether, and to what extent, economic entities created by a tribe share in the tribe's immunity from suit (*see generally American Prop. Mgt. Corp. v Superior Court*, 206 Cal App 4th 491, 500). "Tribal subagencies and corporate entities created by the Indian Nation to further governmental objectives, such as providing housing, health and welfare services, may also possess attributes of tribal sovereignty, and cannot be sued absent a waiver of immunity" (*Ransom*, 86 NY2d at 558-559; *see Breakthrough Mgt. Group, Inc.*, 629 F3d at 1183). The critical question is "whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe" (*Allen*, 464 F3d at 1046), i.e., whether the entity is "so closely allied with and dependent upon the [t]ribe that it is entitled to the protection of tribal sovereign immunity" (*Ransom*, 86 NY2d at 560; *see Gristede's Foods, Inc. v Unkechuage Nation*, 660 F Supp 2d 442, 477).

Federal and state courts have articulated various factors to be considered in evaluating whether a particular entity is an "arm" of a tribal government for sovereign immunity purposes (*see e.g. Warren*, 859 F Supp 2d at 540, *affd* 2013 WL 1748957; *Breakthrough Mgt. Group, Inc.*, 629 F3d at 1187-1188; *Gristede's Foods, Inc.*, 660 F Supp 2d at 477-478; *Ransom*, 86 NY2d at 559; *Seneca Niagara Falls Gaming Corp. v Klewin Bldg. Co., Inc.*, 2005 WL 3510348, *3-5 [Conn]). In *Ransom*, the

New York Court of Appeals stated that, "[a]lthough no set formula is dispositive, in determining whether a particular tribal organization is an 'arm' of the tribe entitled to share the tribe's immunity from suit, courts generally consider such factors as whether:

> the entity is organized under the tribe's laws or constitution rather than Federal law; the organization's purposes are similar to or serve those of the tribal government; the organization's governing body is comprised mainly of tribal officials; the tribe has legal title or ownership of property used by the organization; tribal officials exercise control over the administration or accounting activities of the organization; and the tribe's governing body has power to dismiss members of the organization's governing body . . . *More importantly, courts will consider whether the corporate entity generates its own revenue, whether a suit against the corporation will impact the tribe's fiscal resources, and whether the subentity has the 'power to bind or obligate the funds of the [tribe]' . . .* The vulnerability of the tribe's coffers in defending a suit against the subentity indicates that the real party in interest is the tribe" (*id.* at 559-560 [emphasis added]).

Factors cited by other courts include whether the tribe intended to cloak the entities with sovereign immunity and whether the fundamental purposes of tribal sovereign immunity, i.e., "promot[ing] the goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development" (*Oklahoma Tax Commn. v Citizen Band Potawatomi Indian Tribe of Okla.*, 498 US 505, 510 [internal quotation marks omitted]), are served by extending immunity to the entities (*see Breakthrough Mgt. Group, Inc.*, 629 F3d at 1181; *Dixon v Picopa Constr. Co.*, 160 Ariz 251, 258, 772 P2d 1104, 1111). "[C]ommon among these factors is that the tribal entity operates 'not as a mere business,' . . . but rather as an extension of the tribe's own economic activity, 'so that its activities are properly deemed to be those of the tribe' itself" (*Gristede's Foods*, *Inc.*, 660 F Supp 2d at 478). Notably, "the burden of proof for an entity asserting immunity as an arm of a sovereign tribe is on the entity to establish that it is, in fact, an arm of the tribe" (*id.* at 466).

III

As defendants correctly note, several federal and state courts have determined that SGC and SNFGC are entitled to sovereign immunity as subordinate arms or instrumentalities of SNI (*see e.g. Warren*, 859 F Supp 2d at 541 ["SGC is a governmental instrumentality entitled to tribal immunity"]; *Myers v Seneca Niagara Casino*, 488 F Supp 2d 166, 168 n 2 [SNFGC "enjoys all of the privileges and immunities of the Nation"]; *Seneca Niagara Falls Gaming Corp.*, 2005 WL 3510348, at *6

[SNFGC "is a tribal entity entitled to tribal immunity"]). Defendants contend that there is "no legally relevant distinction" between SGC, SNFGC, and LGCC, and thus that LGCC is similarly protected by the Nation's sovereign immunity. We reject that contention. Applying the *Ransom* factors and the general principles enunciated by the federal courts and our sister states, we conclude that LGCC is not an "arm" of the Nation and therefore falls outside the Nation's cloak of sovereign immunity (*see generally Dixon*, 160 Ariz at 252-259, 772 P2d at 1105-1112).

As the court properly found, several of the *Ransom* factors weigh in favor of extending sovereign immunity to LGCC. There is no question that LGCC is "organized under the tribe's laws or constitution rather than Federal law" (*id.* at 559). Further, LGCC's "governing body is comprised mainly of tribal officials," and "the tribe's governing body has power to dismiss members of the organization's governing body" (*id.*). LGCC's board is comprised "solely of the members of the board of directors of [SGC]," all of whom are appointed by the Nation's Council. SGC's board consists of between four and seven members, a supermajority of whom must be enrolled members of the Nation. The Council may remove a board member for cause "upon a recommendation of the majority of the [b]oard" or on its own initiative with the votes of at least 10 members of the Council. Moreover, the Nation "exercise[s] control over the administration or accounting activities of [LGCC]" (*id.*). LGCC's Charter requires it to seek the Council's "review and approval" before engaging in any activities that "require a significant expenditure of Company resources." Similarly, although LGCC can give guarantees and incur liabilities, "significant guarantees or liabilities shall be subject to the approval of [the] Council." Any contracts or agreements with governmental entities must be approved by the Council. Further, "purchases of real property and significant expenditures of personal property shall be subject to the approval of [the] Council." LGCC is required to prepare quarterly reports and an annual report, copies of which are provided to the Council, and the Nation may inspect LGCC's books, records, and property at all reasonable times.

Other factors, however, including what the Court of Appeals has characterized as the "[m]ore important[]" financial factors, weigh in favor of a determination that LGCC does not share in the Nation's sovereign immunity (*id.*). With respect to whether LGCC's "purposes are similar to or serve those of the tribal government" (*id.*), we conclude that this factor supports the denial of sovereign immunity to LGCC. In minutes from its August 2002 meeting approving the creation of SGC, the Council declared that "it is . . . the policy of the Nation to promote the welfare and prosperity of its members and to actively promote, attract, encourage and develop economically sound commerce and industry through governmental action for the purpose of preventing unemployment and economic stagnation," and that "the Gaming industry is vitally important to the economy of the Nation and the general welfare of its members." To that end, the Council created SNFGC for the purpose of "developing, financing, operating and conducting the Nation's gaming operations on its Niagara Falls Territory at the Niagara Falls Gaming Facility." In creating the

LGCC, the Council declared that, "in furtherance of the economic success of the Nation's gaming operations, [SNFGC] has commenced development of a . . . golf course located in the Town of Lewiston, New York[, which] *will be developed and operated as an amenity to . . . SNFGC's casino operations*, . . . the purpose of which amenities is to enhance the overall success and profitability of the casino's operations" (emphasis added). In that manner, the Council believed that the golf course project "may reasonably be expected to benefit, directly *or indirectly*, the Nation" (emphasis added). Thus, the Council's own statements reflect that the purpose of LGCC – to develop a golf course as an "amenity" to the Nation's gaming operations – is several steps removed from the purposes of tribal government, e.g., "promoting tribal welfare, alleviating unemployment, [and] providing money for tribal programs" (*Gristede's Foods, Inc.*, 660 F Supp 2d at 477; *cf. Ransom*, 86 NY2d at 560).

The documents LGCC submitted to NCIDA in support of its request for tax relief and other economic assistance further indicate that the central purpose of the golf course project was not to provide funds for traditional governmental programs or services but, rather, was to serve as a regional economic engine (*see generally Dixon*, 160 Ariz at 258, 772 P2d at 1111). In the PILOT agreement, LGCC and NCIDA explicitly recognized that the purpose of the project "is to *create or retain permanent private sector jobs in Niagara County*" (emphasis added). In its application for assistance, LGCC's predecessor in interest asserted that it was

> "looking to create a championship level public/semi-private golf course *offering the millions of visitors of the Niagara Falls region and the patrons of the Seneca Niagara Casino & Hotel a new tourist destination project* that will attract golf enthusiasts from Canada and the United States and to capitalize on the growing tourist market, *which will create new jobs and allow for prolonged stays in the area*" (emphasis added).

Notably absent is any reference to improving the quality of life on reservation lands, creating jobs for Native Americans living on the reservation, or generating funds to support educational, social, or other government-related programs for tribal members. Indeed, even in the construction of the golf course, LGCC pledged to use Niagara County contractors and subcontractors (not tribal businesses) for the project.

Moreover, contrary to the assertion of defendants, the record establishes that LGCC, not the Nation, "has legal title or ownership of" the golf course property (*Ransom*, 86 NY2d at 559). The only alleged support for defendants' assertion that the Nation "owns all of [LGCC]'s improvements and assets, including the golf course property" is the provision in LGCC's Charter that, upon LGCC's dissolution or liquidation, its "remaining property and assets . . . shall be

distributed to SNFGC or, at the Nation's direction, to one or more organizations designated pursuant to a plan of distribution." That fact does not, however, establish legal title or ownership of the property at issue. With respect to what defendants term the "financial interconnectedness factors" (*see id.* at 559-560), we conclude that such factors weigh *against* extending the Nation's sovereign immunity to LGCC. With respect to the *Ransom* financial factors, we note that: (1) LGCC generates its own revenue; (2) there is no evidence in the record (and there is significant evidence to the contrary) that a suit against LGCC would impact the Nation's fiscal resources; and (3) LGCC does not have binding authority over the Nation's funds (*see id.*). In creating the LGCC, the Council stated that it decided to form a "separate corporation or legal entity to own and operate the Lewiston Golf Course . . . due to various legal and accounting considerations, including the status of the Lewiston Golf Course as an off-territory business venture of the Nation, subject to legal, tax and other requirements that are not applicable to the Nation's on-territory businesses." To that end, the Council "authorized and directed" LGCC to "develop and implement legitimate tax strategies to minimize any tax obligations of [LGCC], including, but not limited to, maximizing the tax savings benefits offered by the [NCIDA] and utilizing net operating losses, if any, incurred by the Company, to offset the Company's future profits." Thus, unlike the Nation itself or its closely-associated gaming entities, i.e., SNG and SNFGC, LGCC was intended to function as a regular business entity, with profits, losses, and legal and tax obligations applicable to any other business operated outside the confines of an Indian reservation by a non-native entity.

Further, LGCC's Charter clearly provides that LGCC has no power to bind or otherwise obligate the funds of the Nation, stating, inter alia, that "[n]o activity of the Company nor any indebtedness incurred by it shall encumber, implicate or in any way involve assets of the Nation or another Nation Entity not assigned or leased in writing to the Company"; "the Nation shall not be liable for the debts or obligations of the Company, and the Company shall have no power to pledge or encumber the assets of the Nation"; "[t]he Obligations of the Company shall not be a debt of the Nation or of [SGC] or any other Nation-chartered Gaming corporation"; and "[t]he Company shall not have[] any power . . . to borrow or lend money on behalf of the Nation, or to grant or permit or purport to grant or permit any right, lien, encumbrance or interest in or on any of the assets of the Nation" (*see id.* at 559).

Moreover, the record is devoid of evidence that a lawsuit against LGCC would adversely impact the Nation's treasury either directly or indirectly (*see id.* at 559-560). Unlike SGC, SNFGC, and other tribal entities that are obligated to pay large sums to the Nation on a regular basis (*see Warren*, 859 F Supp 2d at 541, *affd* 2013 WL 1748957 ["(Al)though a suit against SGC will not directly impact the Nation's fiscal revenues, a large judgment could render it unable to meet its significant financial obligations to the SNI"]; *Breakthrough Mgt. Group, Inc.*, 629 F3d at 1194-1195 [casino required to pay up to $1 million each month to the tribe]), there is no evidence on this record

that LGCC is so obligated.  Indeed, LGCC's certificate of existence states that "the corporation has no obligation to pay any franchise taxes to [SNI]."  Further, unlike the Nation's heavily regulated gaming operations, the revenue from which must only be used "to fund tribal government operations or programs . . . [,] to provide for the general welfare of the Indian tribe and its members . . . [,] to promote tribal economic development . . . [,] to donate to charitable organizations[,] or . . . to help fund operations of local government agencies" (25 USC § 2710 [b] [2] [B]), there is no evidence that the funds generated by the golf course project are earmarked for the Nation in general or its governmental programs in particular (*cf. Breakthrough Mgt. Group, Inc.*, 629 F3d at 1195 ["(T)he evidence reveals that the Tribe depends heavily on the Casino for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities.  One hundred percent of the Casino's revenue goes to the Authority and then to the Tribe.  Therefore, . . . any reduction in the Casino's revenue that could result from an adverse judgment against it would therefore reduce the Tribe's income"]).

Finally, we note that declining to extend sovereign immunity to LGCC under the circumstances of this case will not diminish the policies underlying tribal sovereign immunity.  "Indeed, an Indian tribe's ability to create a legally distinct non-immune entity . . . promotes commercial dealings between Indians and non-Indians by allowing tribes to participate in commercial transactions without the added complexity and expense that sovereign immunity concerns bring to a transaction" (*American Prop. Mgt. Corp.*, 206 Cal App 4th at 507-508).  Here, permitting LGCC to retreat behind the Nation's cloak of sovereign immunity after it held itself out as an independent, market-participating entity subject to the jurisdiction of the State of New York, including its courts, would discourage non-Indians from entering into business relationships with the Nation's corporations, which "may well retard [the Nation's] economic growth" and undermine one of the purposes of its sovereign immunity (*Dixon*, 160 Ariz at 259, 772 P2d at 1112).  We thus conclude that the court properly denied that part of defendants' motion seeking to dismiss the first amended complaint against LGCC on sovereign immunity grounds.

IV

We agree with defendants, however, that the court should have granted that part of their motion seeking to dismiss plaintiff's third cause of action, which alleges breach of the implied covenant of good faith and fair dealing, as duplicative of the breach of contract cause of action inasmuch as the first amended complaint "fails to allege defendants' violation of a duty independent of the . . . agreement" (*Williams v Coppolla*, 23 AD3d 1012, 1013, *lv dismissed* 7 NY3d 741; *see Makuch v New York Cent. Mut. Fire Ins. Co.*, 12 AD3d 1110, 1111).  We therefore modify the order accordingly.

Contrary to the further contention of defendants, however, we conclude that the court properly denied that part of their motion seeking to dismiss the sixth cause of action, which alleges fraud.

Plaintiff stated a cause of action for fraudulent inducement sufficient to withstand a motion to dismiss (*see generally Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956; *Wagner Trading Co. v Tony Walker Retail Mgt. Co.*, 277 AD2d 1012, 1012) and, on this record, it cannot be determined whether the fraud cause of action is merely duplicative of the breach of contract cause of action (*see generally Contacare, Inc. v CIBA-Geigy Corp.*, 49 AD3d 1215, 1216, *lv denied* 10 NY3d 714; *Crawford Furniture Mfg. Corp. v Pennsylvania Lumbermens Mut. Ins. Co.*, 244 AD2d 881, 881-882).

V

Accordingly, we conclude that the order should be modified by granting that part of defendants' motion seeking to dismiss the third cause of action and that the order should otherwise be affirmed.

Entered:  June 14, 2013                    Frances E. Cafarell
                                           Clerk of the Court